IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 23-cv-01507-NYW-SBP

BRADLEY K. BARTELLI, D.M.D.,

    Plaintiff,

v.

EMPOWER ANNUITY INSURANCE COMPANY OF AMERICA, and
DOES 1–10,

    Defendants.

## ORDER ON MOTION TO AMEND

This matter is before the Court on Plaintiff's Motion for Leave to File First Amended Complaint (the "Motion" or "Motion to Amend"). [Doc. 28]. The Court has reviewed the Motion and the related briefing and concludes that oral argument would not assist in the resolution of this matter. For the reasons set forth herein, the Motion to Amend is respectfully **GRANTED**.

### BACKGROUND

This case arises out of an insurance coverage dispute between Bradley K. Bartelli, D.M.D. ("Plaintiff" or "Dr. Bartelli") and Empower Annuity Insurance Company of America ("Defendant" or "Great-West").[1] *See generally* [Doc. 1]. Dr. Bartelli previously practiced as a dentist and was a member of the American Dental Association ("ADA"). [*Id.* at ¶¶ 7, 9]. Dr. Bartelli held disability insurance through an ADA-offered group disability insurance

---

[1] The Complaint alleges that Defendant was formerly known as Great-West Life & Annuity Insurance Company. [Doc. 1 at ¶ 4]. Both Parties refer to Defendant using its former name, *see* [Doc. 28 at 1; Doc. 29 at 1], and the Court follows the Parties' convention.

policy underwritten by Great-West. [*Id.* at ¶ 9]. The insurance policy provided a monthly benefit in the event an insured becomes "Totally Disabled," defined in the policy as:

(A) due to an Accident or Sickness, an insured Member is unable to perform the substantial and material duties of his profession or occupation;

(B) a Member who qualifies as Residually Disabled will not be considered Totally Disabled during any time he is Residually Disabled; and

(C) the Member is under the Regular Care of a Physician.

[*Id.* at ¶ 10 (emphasis omitted)]. The policy defines "Residually Disabled" as:

(A) due to an Accident or Sickness, an insured Member is able to do some, but not all of the substantial and material duties of his profession or occupation, or is able to do all of the substantial and material duties of that profession or occupation but for less than full-time;

(B) the Member is not Totally Disabled; and

(C) the Member's "Monthly Income" from all sources during a month does not exceed 80% of his pre-disability "Prior Monthly Income[,"] (as defined in the RESIDUAL DISABILITY provision);

(D) the Member is under the Regular Care of a Physician.

[*Id.* at ¶ 11 (emphasis omitted)].

In 2011, Dr. Bartelli was diagnosed with fibromyalgia, which causes persistent and extreme pain and swelling in his muscles and joints, and was later diagnosed with spondylosis, cervical disc displacement, disc bulges, and tendonitis and inflammation of the shoulder muscles. [*Id.* at ¶¶ 12–14]. In 2015, a physician certified that Dr. Bartelli is Totally Disabled due to his diagnoses. [*Id.* at ¶ 15]. Dr. Bartelli was forced to quit his job due to his impairments and filed a disability claim with Great-West on January 27, 2015. [*Id.* at ¶¶ 18–19]. On April 27, 2016, Great-West approved the claim and declared that Dr. Bartelli qualified as Totally Disabled. [*Id.* at ¶ 21].

2

On or about April 5, 2021, Great-West sent a letter to Dr. Bartelli's counsel stating that it was necessary for Dr. Bartelli to undergo an independent medical evaluation ("IME"), which Plaintiff resisted.  [*Id.* at ¶¶ 25–26].  After Great-West threatened to impose monetary penalties or terminate Plaintiff's disability benefits, an IME was set for December 16, 2021.  [*Id.* at ¶¶ 26–27].  Dr. Bartelli alleges that the doctor performing the IME and the doctor's staff were uninformed and unprepared for the visit, that the doctor performed cursory tests unrelated to Plaintiff's disability, and that the doctor "exhibited clear bias in favor of the insurance company."  [*Id.* at ¶¶ 28, 31–32].  Great-West denied Dr. Bartelli's disability claim based on the IME, but after an appeal of the decision, Great-West acknowledged that the IME was unreliable and requested an IME with a different physician.  [*Id.* at ¶¶ 33–34, 36].  Great-West later approved Dr. Bartelli's claim, but concluded that he is only Residually Disabled, not Totally Disabled, which renders Dr. Bartelli eligible for "a fraction of his disability benefits."  [*Id.* at ¶¶ 44–45].

Plaintiff initiated this action against Great-West and 10 unnamed Doe Defendants on June 14, 2023.  *See* [*id.* at 1].  He asserts two claims:  (1) a breach of contract claim, and (2) a claim under 215 Ill. Comp. Stat. Ann. 5/155.  [*Id.* at ¶¶ 47–61].  On November 1, 2023, the Honorable S. Kato Crews entered the Scheduling Order in this case, setting the deadline for amendment of pleadings at December 22, 2023.  [Doc. 21 at 8].  On March 21, 2024, Plaintiff filed the Motion to Amend.  [Doc. 28].  He asks for leave of Court to amend his Complaint to add additional factual allegations and to add claims for common law bad faith and common law promissory estoppel.  *See* [*id.*; Doc. 28-1 at 38–42 ¶¶ 45–46, 59, 62–78].  Great-West opposes the Motion.  [Doc. 29].  The Court considers the Parties' arguments below.

3

## LEGAL STANDARDS

When a party files a motion to amend after the expiration of the deadline to amend pleadings, the Court considers the motion pursuant to both Rule 15 and Rule 16 of the Federal Rules of Civil Procedure. First, the Court determines whether the moving party has demonstrated good cause to amend the Scheduling Order pursuant to Rule 16(b). *See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Assoc.*, 771 F.3d 1230, 1242 (10th Cir. 2014). Then, the Court considers whether the amendment is appropriate under Rule 15(a). *Id.*

Rule 16(b) provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "In practice, this standard requires the movant to show the 'scheduling deadlines cannot be met despite [the movant's] diligent efforts.'" *Gorsuch*, 771 F.3d at 1240 (quoting *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) (alteration in original)). This burden is satisfied when, for example, a party learns of new information through discovery, or when the governing law has changed. *Id.* "Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." *Colo. Visionary Acad. v. Medtronic, Inc.*, 194 F.R.D. 684, 687 (D. Colo. 2000).

Rule 15(a), on the other hand, provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Court may refuse leave to amend upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). A general

4

presumption exists in favor of allowing a party to amend its pleadings, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), and the non-moving party bears the burden of showing that the proposed amendment is improper, *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv. Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999); *see also Corp. Stock Transfer, Inc. v. AE Biofuels, Inc.*, 663 F. Supp. 2d 1056, 1061 (D. Colo. 2009) (non-moving party has burden of demonstrating futility). Whether to allow amendment is within the trial court's discretion. *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978–79 (10th Cir. 1996).

## ANALYSIS

### I. Good Cause Under Rule 16(b)(4)

Because the Motion was filed after the deadline to amend pleadings, the Court must first determine whether good cause exists to amend the Scheduling Order under Rule 16(b)(4). *Gorsuch*, 771 F.3d at 1242.

Dr. Bartelli argues that there is good cause to amend the Scheduling Order because he first learned on March 18, 2024—during a mediation with Defendant—that Great-West "had no intention of tendering Residual Disability benefits" to him, which provides the basis for his proposed new claims. [Doc. 28 at 6–7]. He contends that he acted diligently in moving to amend just three days after learning this information. [*Id.* at 7]. Great-West disputes that Plaintiff can show good cause for the late amendment. [Doc. 29 at 14–15]. It contends that "Plaintiff's own actions show that (1) any information learned during mediation was not the cause of his request to amend, (2) there was no reason he could not have amended prior to the deadline, and (3) there is not good cause to now allow for amendment." [*Id.* at 14]. Defendant posits that Plaintiff's original Complaint and his positional statement in the Scheduling Order "have always disputed

5

Great-West's Residual Disability determination," and it contends that the proposed amendment, which is based on Great-West's denial of Residual Disability benefits, is untimely. [*Id.*]. Defendant also represents that a week prior to the Parties' mediation, Plaintiff proposed a similar pleading amendment to Great-West, which shows that "[m]ediation could not have been the impetus of this amendment." [*Id.* at 14–15]. Plaintiff does not respond to this argument in his reply brief. See generally [Doc. 30].

The Court respectfully disagrees with Defendant's argument. The Complaint alleges that Defendant withdrew its determination that Plaintiff is Totally Disabled and, at that time, took the position that Plaintiff was Residually Disabled, but that Defendant continued to delay payment of Residual Disability benefits. [Doc. 1 at ¶¶ 45–46]. The Complaint does not allege that Defendant withdrew its approval of Plaintiff's Residual Disability claim, *see generally* [*id.*], which Plaintiff contends occurred at the Parties' March 18 mediation, *see* [Doc. 28 at 4; Doc. 28-1 at 2 ¶ 8]. Notably, Defendant does not dispute that Plaintiff learned of this changed position for the first time at the mediation. *See generally* [Doc. 29].

The Scheduling Order also paints a different picture of Defendant's position than that contained in Plaintiff's proposed Amended Complaint. Plaintiff's positional statement in the Scheduling Order states, inter alia, that

> On May 5, 2023, Great-West approved Dr. Bartelli's disability claim, but asserted he is no longer Totally Disabled, rather that he is now Residually Disabled, and thus only eligible for a fraction of his benefits. Dr. Bartelli provided Great-West the financial records necessary for it to calculate and issue Residual Disability benefits, but it inexplicably failed to do so.

[Doc. 21 at 3]. In its own positional statement, Great-West countered that

> In March 2023 Plaintiff submitted additional, more recent medical records of Plaintiff, including a letter from a Texas physician, Dr. Bednar, that

6

>    supported Dr. Bartelli's disability due to pain.  Based on this submission, <u>Defendant determined that Dr. Bartelli satisfied the medical prong of a Residual Disability under the Certificate</u>.  Defendant outlined the financial documents needed to satisfy the financial prong of a Residual Disability under the Certificate.  Plaintiff recently provided those documents.

[*Id.* at 5 (emphasis added)].  Thus, at the time the Scheduling Order was entered, Defendant still maintained the position that Plaintiff was not Totally Disabled, but *was* Residually Disabled—a position that apparently changed at the Parties' mediation.

The Court has also compared the proposed pleading Plaintiff purportedly sent to Defendant a week before the Parties' mediation, *see* [Doc. 29-8 at 4–20], with the proposed Amended Complaint Plaintiff now seeks leave to file, *see* [Doc. 28-1 at 26–44], and finds material differences between the two—namely, Plaintiff's new allegations that "[w]ithout providing any correspondence, explanation, or decision informing Dr. Bartelli of this critical claims decision, Great-West withdrew its Residual Disability claim approval on March 18, 2024," [Doc. 28-1 at 35 ¶ 46], and that Great West "fail[ed] to respond to Dr. Bartelli's numerous communications regarding the status of Residual Disability benefits and failing to inform Dr. Bartelli of critical claims decisions, including the withdrawal of his Residual Disability claim approval," [*id.* at 40 ¶ 64(l)].  Similarly, Plaintiff's proposed promissory estoppel claim is based on allegations that Great-West represented to Plaintiff that he qualifies for Residual Disability Benefits and failed to keep that alleged promise. [*Id.* at 42 ¶¶ 72–78].

Taking as true counsel's unrebutted representation that Plaintiff learned for the first time at the March 18, 2024 mediation that Great-West had withdrawn its approval of Dr. Bartelli's Residual Disability benefits claim, the Court finds that Plaintiff acted diligently in moving to amend with respect to that information.  *See Swanson v. N. Light Specialty Ins.*

7

*Co.*, No. 20-cv-03778-RMR-NRN, 2022 WL 500294, at *3 (D. Colo. Feb. 18, 2022) (the plaintiff acted diligently in moving to amend five weeks after learning of new information that formed the basis of the amendment). Therefore, <u>to the extent Plaintiff's proposed amendments are based on Defendant's withdrawal of its approval of the Residual Disability claim, or any related lack of correspondence, explanation, or communication, or other related conduct</u>, Plaintiff has shown good cause for the belated amendment. To the extent Plaintiff's proposed bad faith claim is based on any other alleged claims-handling conduct, Plaintiff has not identified when he learned of that alleged conduct and has not shown good cause to amend with respect to that conduct. Accordingly, the Court's remaining analysis under Rule 15 is limited to the proposed bad faith and promissory estoppel claims based on Defendant's withdrawal of approval of the Residual Disability benefits claim and Defendant's alleged related conduct.

## II. Whether Amendment is Appropriate Under Rule 15(a)

Having decided that good cause exists for amendment under Rule 16, the Court must decide whether the proposed amendment is appropriate under Rule 15(a). As mentioned above, the Court may deny leave to amend based on undue delay, undue prejudice to opposing parties, bad faith, failure to cure deficiencies by amendments previously allowed, or futility of amendment. *Frank*, 3 F.3d at 1365.

Defendant, who bears the burden of demonstrating that the requested amendment is improper, *see Moody's Inv. Servs., Inc.*, 175 F.3d at 859, argues that amendment would be futile because Plaintiff's proposed bad faith claim fails as a matter of law, [Doc. 29 at 6–13]. Specifically, Great-West argues that the insurance policy's choice-of-law provision, which provides that "[t]he Policy and any dispute between an insured Member

8

and the Company arising in connection therewith are subject to, governed by, and shall be construed in accordance with the law of the State of Illinois," *see* [*id.* at 2 (emphasis omitted)], applies to *all* claims arising under or in any way related to the insurance policy, such that Illinois law applies to the proposed bad faith claim, [*id.* at 7, 10]. And because Illinois law does not recognize a common law bad faith claim, Defendant concludes that amending to include a bad faith claim would be futile. [*Id.* at 12–13]. It also argues that the proposed promissory estoppel claim is improper because, under either Colorado or Illinois law, that claim is only available if no express contract exists. [*Id.* at 13–14]. Dr. Bartelli disagrees that amendment would be futile, arguing that under Colorado choice-of-law rules, Colorado substantive law applies to his proposed bad faith claim. [Doc. 30 at 5–7]. He does not respond to Defendant's futility argument with respect to the promissory estoppel claim. *See generally* [*id.*].

### A. Common Law Bad Faith

The Parties' dispute over the proposed bad faith claim requires the Court to examine applicable choice-of-law principles. Because the Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, the Court applies the conflict-of-law rules of the forum state—Colorado. *Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014). "Any conflict of laws analysis begins, perforce, with a determination whether a conflict actually exists," as a choice-of-law analysis is only necessary if there is an outcome-determinative conflict of law. *Richardson v. Allstate Fire & Cas. Ins. Co.*, 637 F. Supp. 3d 1186, 1190 (D. Colo. 2022). Here, the Parties agree that an outcome-determinative conflict of law exists between Colorado and Illinois law. *See* [Doc. 29 at 12–13; Doc. 30 at 1]. Indeed, Colorado law recognizes a common law bad faith claim in

9

insurance cases, but Illinois law does not.  *Compare Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003) (an insurer's breach of the duty of good faith and fair dealing "gives rise to a separate cause of action sounding in tort"), *with Boone v. MB Fin. Bank, N.A.*, 375 F. Supp. 3d 987, 995 (N.D. Ill. 2019) ("Illinois law . . . does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing.").  A choice-of-law examination is therefore appropriate.

"Colorado follows the Restatement (Second) of Conflict of Laws (1971) . . . for both contract and tort actions."  *Kipling*, 774 F.3d at 1310 (citing cases).  Section 6 of the Restatement provides that absent a statute setting forth the governing law, courts should consider the following principles when determining which state's substantive law is applicable in a given case:  (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and application of the law to be applied.  *See* Restatement (Second) of Conflict of Laws § 6(2) (1971).

The "choice of law in a given case is not made once for all issues; each issue is to receive separate consideration if it is one that would be resolved differently under the local law rule of two or more of the potentially interested states."  *Flaherty v. Banner Life Ins. Co.*, No. 20-cv-00581-REB-GPG, 2022 WL 1198909, at *1 (D. Colo. Feb. 7, 2022) (quotation omitted).  For both tort and contract claims, the Restatement sets forth a "most significant relationship" test under the principles articulated in § 6.  *See* Restatement

§ 145(1) (tort claims); *id.* § 188(1) (contract claims); *see also Kipling*, 774 F.3d at 1310–11. But the use and parameters of the most significant relationship test vary depending on the type of claim at issue. For contract claims, the Restatement provides that a court must first determine whether an enforceable contractual choice-of-law provision dictates the applicable law. "The law of the state chosen by the parties to govern their contractual rights and duties will be applied" unless (a) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (b) application of the chosen state's law "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2). If there is no applicable choice-of-law provision, courts consider the following factors "to be taken into account in applying the principles of § 6 to determine" the state with the most significant relationship to the contract dispute:

    (a)   the place of contracting,

    (b)   the place of negotiation of the contract,

    (c)   the place of performance,

    (d)   the location of the subject matter of the contract, and

    (e)   the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Id.* § 188(1)–(2).

Tort claims are analyzed differently. The Restatement does not contemplate consideration of an applicable choice-of-law provision governing tort claims, instead directing courts to proceed directly to the most significant relationship test. *See id.*

11

§ 145(1) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6."). For tort claims, the relevant contacts in determining the state with the most significant relationship to the dispute include:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2).

The Parties dispute whether the Court's choice-of-law analysis begins and ends with the policy's choice-of-law provision, as Defendant contends, *see* [Doc. 29 at 10–11], or whether the Court should employ Restatement § 145's most significant relationship test, as Plaintiff argues, *see* [Doc. 30 at 5–7]. Defendant argues that the choice-of-law provision is broad enough to include not just contract claims, but any related tort claims, too, because the proposed bad faith claim "arises in relation to the Policy, and produces a dispute between the insured and Great-West in relation to the Policy." [Doc. 29 at 10]. Plaintiff disagrees, arguing that the Court should follow the general practice in Colorado of applying the most significant relationship test to his proposed tort claim, regardless of the choice-of-law provision. [Doc. 30 at 5–6]. He directs the Court to a number of cases that, according to Plaintiff, "have applied tort choice of law principles to tort claims

12

involving a contractual choice of law provision." [*Id.* at 6].[2]

The Parties have not cited any case law from a Colorado court thoroughly analyzing whether parties to an insurance contract can contract around the implied duty of good faith and fair dealing imposed by Colorado law or whether a broad contractual choice-of-law provision can supersede the general rule that, for tort claims, courts must apply the law of the state with the most significant relationship to the dispute.[3]  The Court could not locate any such authority through its independent research.  Thus, the Court must attempt to predict how the Colorado Supreme Court would rule on this issue.  *Wade*

---

[2] The Court notes, however, that a number of the cases relied upon by Plaintiff involve narrow choice-of-law provisions that were construed to only apply to contract-interpretation disputes.  *See, e.g.*, *Gunn v. Carter*, No. 13-cv-02197-WJM-MEH, 2016 WL 7899902, at *7–8 (D. Colo. June 13, 2016) (applying tort choice-of-law rules despite contractual choice-of-law provision), *but see Gunn v. Carter*, No. 13-cv-02197-WJM-MEH, ECF No. 231-23 at 10 (D. Colo. Nov. 30, 2015) (choice-of-law provision in contract stating that "[t]his Agreement shall be deemed to be a contract made under the laws of the state of Ohio and shall be construed in accordance with the laws of said state"); *Bio Med Techs. Corp. v. Sorin CRM USA, Inc.*, No. 14-cv-00154-WJM-CBS, 2015 WL 428580, at *1 (D. Colo. Jan. 30, 2015) (choice-of-law provision stating that the "laws of the State of Minnesota shall govern [the] Agreement in all respects" (alteration in original)); *but see Williams v. Allstate Prop. & Cas. Ins. Co.*, No. 19-cv-03368-REB-KLM, 2020 WL 9432923, at *4 (D. Colo. June 9, 2020) (acknowledging broad choice-of-law provision in insurance policy but concluding that "[d]espite their connection to the insurance policy contract at issue here, the Court must analyze Plaintiff's bad faith claims under tort law" and proceeding to employ the most significant relationship test), *report and recommendation adopted in relevant part*, *Williams v. Allstate Prop. & Cas. Ins. Co.*, 2020 WL 9432884 (D. Colo. Sept. 28, 2020).

[3] The Court is respectfully unpersuaded by Defendant's reliance on this Court's prior decision in *Openwater Safety IV, LLC v. Concept Special Risks, Ltd*, No. 18-cv-01400-NYW, 2018 WL 11435659 (D. Colo. Dec. 12, 2018).  In *Openwater*, the Court had subject matter jurisdiction pursuant to federal admiralty law. *Id.* at *5.  The Court construed the subject choice-of-law provision broadly, concluding that a provision requiring that "any dispute arising" under the insuring agreement be adjudicated in accordance with admiralty law or New York law applied to all of the plaintiff's claims, including tort claims. *Id.* at *5–6.  *Openwater* is distinguishable from the instant case because the Court had no occasion to consider the well-established principles governing common law bad faith claims under *Colorado* law, which bear substantially on the Court's discussion below.

*v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007). In so doing, the Court may seek guidance from decisions issued by lower Colorado courts or federal district courts interpreting Colorado law, and may also survey "the general weight and trend of authority in the relevant area of law." *Id.* (quotation omitted).

It is well-established that a common law bad faith claim in the insurance context sounds in tort. *Cary*, 68 P.3d at 466; *see also Pham v. State Farm Mut. Auto. Ins. Co.*, 70 P.3d 567, 571 (Colo. App. 2003). The Court therefore starts from the position that because Colorado has adopted the Restatement's choice-of-law rules, *see First Nat'l Bank in Fort Collins v. Rostek*, 514 P.2d 314, 320 (Colo. 1973), and because the Restatement provides a general rule for tort claims that does not involve consideration of any contractual choice-of-law provision, *see* Restatement § 145, the Court should apply the most significant relationship test to determine which state's law applies to Plaintiff's bad faith claim. To establish futility, Defendant must show that it is appropriate for this federal court to disregard this well-established approach in this case.

However, Defendant's reliance on authority discussing choice-of-law provisions generally, [Doc. 29 at 7], or choice-of-law rules for *contract* claims, [*id.* at 7–9], is not enough to persuade the Court that it can or should ignore the general rule that conflicts of law with respect to tort claims are resolved using the Restatement's most significant relationship test. Defendant does not argue or explain why its concerns about interpreting group insurance contracts uniformly, *see* [*id.* at 9], are even at issue with respect to Plaintiff's proposed bad faith claim, which would concern Defendant's conduct, not policy interpretation, *see* [Doc. 28-1 at 39–41]. Indeed, Colorado courts have recognized that insurance contracts are meaningfully distinct from "ordinary bilateral contracts." *See*

*Nunn v. Mid-Century Ins. Co.*, 244 P.3d 116, 119 (Colo. 2010) ("Rather than entering into a contract to obtain a commercial advantage, insureds enter into insurance contracts for the financial security obtained by protecting themselves from unforeseen calamities and for peace of mind. Furthermore, insurance policies generally are not the result of negotiation due to the significant disparity in the bargaining power between the insurer and the insured." (cleaned up)); *see also Cary*, 68 P.3d at 466 ("[I]nsurance contracts are not ordinary commercial contracts."). Thus, Defendant's reliance on general contract principles has limited utility to the issue presently before the Court.

The Court next considers Defendant's reliance on the choice-of-law provision's express language, which provides that "any dispute between an insured Member and the Company arising in connection [with the insurance policy is] subject to, governed by, and shall be construed in accordance with the law of the State of Illinois." *See* [Doc. 29 at 2]. Defendant insists that the bad faith claim has arisen "in connection with" the policy, so Illinois law must apply. [*Id.* at 10].

However, Colorado courts routinely emphasize that a common law bad faith claim is "separate from, and independent of, any claim under the policy itself." *Flickinger v. Ninth Dist. Prod. Credit Ass'n of Wichita*, 824 P.2d 19, 24 (Colo. App. 1991); *see also Pham*, 70 P.3d at 571 (bad faith claims "exist independently of the liability imposed by an insurance contract"). In Colorado courts' view, a common law bad faith claim in the insurance context "does not arise 'under' [the insurance] contract." *Flickinger*, 824 P.2d at 24; *see also Emenyonu v. State Farm Fire & Cas. Co.*, 885 P.2d 320, 323 (Colo. App. 1994) (concluding that allegations of bad faith did not "arise under the policy itself"); *Burgard v. Alpha Prop. & Cas. Ins. Co.*, No. 22-cv-01812-REB-SKC, 2023 WL 8651467,

at *4 (D. Colo. Aug. 4, 2023) ("[A] claim for bad faith breach of insurance contract is not a claim for insurance coverage and is not a claim under the insurance contract." (emphasis added)).  It is not the contract in and of itself, but the *nature of the relationship between the insured and the insurer*, that provides a basis for bad faith claims.  See *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1268 (Colo. 1985) ("[T]he duty of good faith derives from the relationship of an insured claimant to the provider of benefits.").  While a common law bad faith claim may be tangentially related to an insurance policy—in that the policy was the starting point of the insurer and insured's relationship—the tort claim is decidedly independent from the contract.  And if a bad faith claim "does not arise 'under'" an insurance policy, *Flickinger*, 824 P.2d at 24, this Court predicts that a Colorado court presented with this question would conclude that a bad faith claim, separate and distinct from the insurance contract, does not arise "in connection with" the policy, either.

Furthermore, because a bad faith claim is separate from a claim under the insurance policy, an insurer's tort liability "does not depend upon its liability under the insurance contract." *Flickinger*, 824 P.2d at 24; see also *Domokos v. Shelter Mut. Ins. Co.*, 416 F. Supp. 3d 1209, 1233 (D. Colo. 2019) ("[I]t is clear under Colorado law that a manner-of-dealing [bad faith] claim may go forward even if coverage does not exist, so long as there is evidence to support both liability and damages.").  As a practical matter, then, Defendant's liability for bad faith does not depend on the existence of a successful contractual claim, or even a pending contractual claim.  If this Court were to dismiss Plaintiff's breach of contract claim and statutory claim, the Illinois policy would no longer be at issue in the case, and the bad faith claim would not be asserted "in connection with" the policy, but would be based on the alleged based bad faith *conduct* of Defendant.  This

16

further supports employing the most significant relationship test, which requires consideration of where the conduct and injury occurred, among other factors. *See* Restatement § 145(2).

In the Court's view, unless an insurance contract clearly and expressly demonstrates that the parties have contracted around the insurer's good faith duty, Colorado common law, and Colorado's choice-of-law rules, the Court finds it appropriate to follow Colorado's well-established choice-of-law rules for tort claims and apply the most significant relationship test under § 145 of the Restatement. *Williams v. Allstate Prop. & Cas. Ins. Co.*, No. 19-cv-03368-REB-KLM, 2020 WL 9432923, at *4 (D. Colo. June 9, 2020), *report and recommendation adopted in relevant part*, *Williams v. Allstate Prop. & Cas. Ins. Co.*, 2020 WL 9432884 (D. Colo. Sept. 28, 2020).

Here, the choice-of-law issue was introduced in Defendant's opposition to Plaintiff's Motion to Amend, and Defendant raises no argument with respect to the most significant relationship test. *See generally* [Doc. 29]. It is Defendant's burden to show that the proposed amendment is futile, see *Moody's Inv. Servs., Inc.*, 175 F.3d at 859, and without any affirmative argument from Defendant explaining why Illinois has the most significant relationship to the bad faith claim, the Court cannot conclude that the proposed amendment would be futile. As a result, the Court will grant the Motion to Amend with respect to the bad faith claim.

**B.     Promissory Estoppel**

Next, Defendant argues that the proposed promissory estoppel claim is futile because, either under Colorado or Illinois law, promissory estoppel is only available if there is no express contract. [Doc. 29 at 13–14]. And because there is an express

17

insurance contract here, Defendant argues that the "proposed claim for promissory estoppel fails as a matter of law." [*Id.* at 13].

Despite Plaintiff's failure to respond to this argument, *see* [Doc. 30], the Court has an independent obligation to determine whether Defendant's futility argument is correct. The Court is respectfully unpersuaded by Defendant's contention at this stage of the proceedings. It is well-settled that "[t]he Federal Rules of Civil Procedure allow a party to include alternative or inconsistent claims in its complaint." *United Water & Sanitation Dist. v. Geo-Con, Inc.*, 488 F. Supp. 3d 1052, 1058 (D. Colo. 2020). "As a result, a party may plead a breach of contract claim and a promissory estoppel claim based on the same conduct or document in the alternative." *Id.*; *see also Lamb v. YWCA Metro. Chicago*, No. 23-cv-02821, 2024 WL 773797, at *6 (N.D. Ill. Feb. 26, 2024) (same).[4] While there does not appear to be a dispute about the insurance contract, Defendant does not argue that Plaintiff has made any binding judicial admission that dispenses the need for proof of the fact of an enforceable contract. *See generally* [Doc. 29]. Moreover, it is not clear to the Court whether Plaintiff's proposed promissory estoppel claim is based on the insurance policy or on alleged "specific factual representations that Dr. Bartelli qualifies for Residual Disability under the Policy" Defendant purportedly made on May 5, 2023, *see* [Doc. 28-1 at 42], and Defendant does not address this issue, *see* [Doc. 29 at 13–14]. At this stage and with this record, the Court is unable to conclusively decide that the promissory estoppel claim is futile. Accordingly, the Court will grant the Motion to Amend and permit the promissory estoppel claim to proceed.

---

[4] Defendant does not identify any outcome-determinative conflict of law and instead cites to both Illinois and Colorado law in support of its argument, *see* [Doc. 29 at 13–14], so the Court does not engage in a choice-of-law analysis.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Leave to File First Amended Complaint [Doc. 28] is **GRANTED**; and

(2) On or before **October 22, 2024**, Plaintiff shall file a clean copy of his First Amended Complaint as a separate docket entry.

DATED:  October 18, 2024                       BY THE COURT:

_____
Nina Y. Wang
United States District Judge